UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SIDOR FULCHER,

                          Petitioner,

      v.

HAROLD GRAHAM,

                          Respondent.

**MEMORANDUM
AND ORDER**
14-cv-3910 (LDH)

LASHANN DEARCY HALL, United States District Judge:

Petitioner Sidor Fulcher brings a habeas corpus petition pursuant to 28 U.S.C. § 2254,

challenging his conviction in New York Supreme Court, Kings County, for murder in the second

degree on the following grounds:  (1) ineffective assistance of trial counsel; (2) ineffective

assistance of appellate counsel; (3) violation of his Sixth Amendment right to confront his

accusers; (4) violation of his Fourteenth Amendment right to present a defense;

(5) prosecutorial misconduct; (6) violation of his right to be present during jury selection; and

(7) imposition of an excessive sentence in light of his minimal criminal history.

## BACKGROUND

**I.     INCIDENT AND ARREST**

On August 11, 2006, Igol Isaacs Jr., known as A.J., was shot in Brownsville, Brooklyn.

(Resp't's Aff. in Opp'n to Pet. For Habeas Corpus ("Resp't's Opp'n"), Ex. W at 100–09, ECF

No. 8-7; Resp't's Opp'n, Ex. Y at 71–81, ECF No. 8-9.)  Captain Brian McGee, an NYPD

officer, arrived on the scene before the arrival of any emergency medical personnel.  (Rep't's

Opp'n, Ex. W at 37–39.)  Upon arrival, McGee attempted to speak with A.J., who was gasping

and having trouble breathing.  (*Id.* at 40.)  McGee told A.J. that A.J. "might not make it" and

asked A.J. for the name of the person who had shot him.  (*Id.* at 41.)  A.J. responded with what sounded to McGee as, "Todd shot me."  (*Id.*)  When McGee repeated the name "Todd" back to A.J., A.J. responded, "Tom shot me."  (*Id.*)  A.J. succumbed to his injuries and died on the scene. (*Id.*)

Petitioner and Thomas Clay were identified as A.J.'s shooters by two eyewitnesses:  Troy Harris and Yvette Clay, Mr. Clay's wife.  (*Id.* at 100-09; Resp't's Opp'n, Ex. Y at 75–78.)  Mrs. Clay provided the police with cell phone numbers for Petitioner and Mr. Clay.  (Resp't's Opp'n, Ex. W at 116.)  The police tracked the physical movements of the cell phones associated with those numbers and determined that both Petitioner and Mr. Clay had left Brooklyn in the hours after the shooting, and traveled to North Carolina, where they remained for approximately one month.  (Resp't's Opp'n, Ex. Y at 26–33.)

Both Petitioner and Mr. Clay were arrested upon their return to New York:  Mr. Clay on September 10, 2006; and, Petitioner on November 27, 2006.  (Resp't's Opp'n, Ex. T at 10–14, 65, ECF No. 8-4.)  Mr. Clay was arrested while driving a white Ford Expedition owned by a woman named Tia Lawston.  (*Id.* at 66.)  Following Mr. Clay's arrest, the vehicle was taken into police custody, and subsequently searched with Lawston's consent.  (*Id.* at 66–67.)  Three cell phones were retrieved from the vehicle during the search.  (*Id.* at 67.)

Petitioner was charged with murder in the second degree, manslaughter in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree.  (Resp't's Opp'n, Ex. Z, at 80–81, ECF No. 8-10.)  Mr. Clay was charged with murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon in the second degree.  (*Id.* at 80.)  Petitioner and Mr. Clay were tried jointly.  (Resp't's Opp'n, Ex. W at 2.)

## II.   SUPPRESSION HEARING IN PETITIONER'S CO-DEFENDANT'S CASE

Before trial, Mr. Clay moved to suppress the cell phones obtained during the search of Lawston's car arguing that the cell phones were illegally obtained because the police did not obtain a warrant or Mr. Clay's consent before searching the vehicle.  (Resp't's Opp'n, Ex. T at 88–90.)  Specifically, Mr. Clay argued that the cell phones should be suppressed because, at the time he was arrested, he was driving the vehicle with Lawston's permission and thus "what [was] in the car belong[ed] to him."  (*Id.* at 89.)  The prosecution argued that neither a warrant nor Mr. Clay's consent was required because Lawston had consented to the search.  (*Id.* at 90–91.)  The court ultimately denied Mr. Clay's motion to suppress, finding that the cell phones were obtained during a search that was legally conducted with the consent of the vehicle's owner.  (*Id.* at 92.)

## III.   TRIAL AND SENTENCING

### A.  Cell-Phone Evidence

At trial, the People sought to connect Petitioner to one of the three cell phones retrieved from Lawston's car.  (Resp't's Opp'n, Ex. Z at 10–11.)  Specifically, relying on the testimony of Mrs. Clay and Detective Erick Parks, the People attempted to demonstrate that the cell phone associated with a phone number registered to Marcus Karrby belonged to Petitioner.  (Resp't's Opp'n, Ex. Y at 51–52; Resp't's Opp'n, Ex. Z at 9–10.)  Mrs. Clay testified that she had received a phone call from the Marcus Karrby number approximately two months prior to A.J.'s shooting.  (Resp't's Opp'n, Ex. W at 116–18.)  Mrs. Clay further stated that the individual on the phone, who did not identify himself, directed her to come to the hospital because Mr. Clay had been injured.  (*Id.* at 116.)  Upon arriving at the hospital, Mrs. Clay met Petitioner, whom she believed to be the person who had called from the Marcus Karrby number.  (*Id.* at 116–18.)  Detective

Parks testified that, during his investigation into Mr. Clay's shooting, he had interviewed an individual who was with Mr. Clay at the hospital.  (Resp't's Opp'n, Ex. X at 60–61, ECF No. 8-8.)  Although Detective Parks was unable to conclusively identify that person as Petitioner, he recalled that the person had identified himself as Marcus Kirby, mentioned that he was Mr. Clay's cousin, provided a date of birth that matched Petitioner's, and provided a personal cell phone number that matched the Marcus Karrby number.[1]  (*Id.*)  The court found that the People had a "good faith basis" to argue that Petitioner used the alias Marcus Kirby.  (Resp't's Opp'n, Ex. T at 110.)

### B.  A.J.'s Dying Declaration

On October 25, 2007, the court held a hearing outside of the presence of the jury to determine whether Captain McGee's testimony regarding A.J.'s statement, "Tom shot me," was admissible.  (Resp't's Opp'n, Ex. W at 34, 51–52.)  Mr. Clay made several arguments in an attempt to exclude A.J.'s statement.  (*Id.* at 51–52.)  Petitioner's counsel did not make any separate arguments but stated that he concurred with Mr. Clay.  (*Id.*)  Ultimately the court found that A.J.'s statement was a dying declaration and admitted it.  (*Id.* at 54–55.)

### C.  Eyewitness Testimony

At trial, the People called Mrs. Clay and Troy Harris.  Mrs. Clay testified that she was speaking with a friend on her cell phone while sitting on a bench in a courtyard where A.J. was standing and talking to a group of friends, including Elease Monk, and Mrs. Clay's nephew, Naquan Telfair.  (Resp't's Opp'n, Ex. W at 102–03.)  Mrs. Clay then saw two men walk toward A.J. and begin shooting at him.  (*Id.* at 106.)  A.J. fell to the ground, at which time Mrs. Clay ran toward him.  (*Id.*)  As she ran, Mrs. Clay recognized the shooters as Mr. Clay and Petitioner.  (*Id.*

---

[1] The Court notes that there are two different spellings of this name in the record.

at 109–10.)  Mrs. Clay also testified that she later identified Petitioner in a police lineup.  (*Id.* at 119.)

In contrast to Mrs. Clay's testimony, Mr. Harris testified that he was the only person speaking with A.J. in the minutes leading up to the shooting.  (Resp't's Opp'n, Ex. Y at 71–72.) According to Mr. Harris, he was sitting on a beach chair in front of A.J., who was standing, when he noticed two men approaching from behind A.J.  (*Id.* at 71, 75–76.)  Mr. Harris testified that he recognized Mr. Clay as "Bop," someone who had recently been shot in the neighborhood and may have been seeking revenge.  (*Id.* at 76–77.)  As the two men came closer, one of them said to A.J., "You think I am fucking playing?" to which A.J. replied, "What I do?"  (*Id.* at 77.)  The two men then started shooting at A.J.  (*Id.*)  As A.J. fell to the ground, the two men ran away, at which point Mr. Harris saw Petitioner's face for a "split second."  (*Id.* at 80.)  One week after the shooting, Mr. Harris saw Mr. Clay and Petitioner driving around the same neighborhood together.  (*Id.* at 82.)

### D.  Petitioner's Decision Not to Testify

Petitioner declined to testify at trial.  (*See* Resp't's Opp'n, Ex. Y at 127.)  Upon inquiry from the court, Petitioner's counsel informed the judge that he had been "talking to [Petitioner] from the day th[e] trial began about the possibility of testifying in th[e] case," but that Petitioner "d[id] not wish to testify."  (*Id.*)  The trial judge asked Petitioner whether his decision not to testify was voluntary, to which Petitioner replied, "Yes."  (*Id.* at 126.)

*     *     *

On November 7, 2007, the jury found Petitioner guilty of murder in the second degree.[2] (*See* Pet. Habeas Corpus ("Pet.") at 1, ECF No. 1; Resp't's Opp'n, Ex. Z at 96–97.)  On November 21, 2007, Petitioner was sentenced to twenty-five years to life imprisonment. (Resp't's Opp'n, Ex. Z at 134.)

## IV.   PROCEDURAL HISTORY

### A.  Direct Appeal

Petitioner filed a timely notice of appeal following his conviction.  (Resp't's Opp'n, Ex. A, ECF No. 8-1.)  On September 29, 2008, the Appellate Division, Second Department, granted Petitioner's appeal.  (*Id.*)  On appeal, Petitioner argued that:  (1) he was deprived of his Sixth Amendment right to confront witnesses; (2) he was deprived of his constitutional right to present a defense because he was precluded from eliciting that the People's main witness had a motive to fabricate her testimony; and, (3) his sentence of twenty-five years to life imprisonment was excessive in light of his minimal criminal history.  (*Id.* at 17–30.)  On June 28, 2011, the Second Department affirmed Petitioner's conviction, finding that the sentence imposed was not excessive and that the remainder of Petitioner's claims were without merit.  (*See* Resp't's Opp'n, Ex. D at 100, ECF No. 8-1.)  On August 18, 2011, Petitioner's appellate counsel sought leave to appeal to the New York State Court of Appeals.  (Resp't's Opp'n, Ex. F at 112–14, ECF No. 8-1.)  In the leave application, Petitioner's appellate counsel argued only that Petitioner was deprived of his Sixth Amendment right to confront witnesses against him when the state court admitted A.J's statement identifying his shooter at trial.  (*Id.*)  On November 28, 2011, the Court

---

[2] Although Petitioner's habeas petition states that Petitioner was convicted of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree (*see* Pet. at 1, ECF No. 1) both the trial and sentencing transcripts reflect that Petitioner was convicted of and sentenced on the sole count of murder in the second degree.  (*See* Resp't's Opp'n, Ex. Z at 96, 134, ECF No. 8-10.)

of Appeals denied Petitioner's application.  (Pet. at 3.)  On May 14, 2012, the Supreme Court of

the United States denied Petitioner's request for a writ of certiorari.  (*Id.* at 3–4.)

### B.  Post-Conviction Collateral Relief and Instant Habeas Petition

On February 18, 2013, pursuant to N.Y. Crim. Proc. Law § 440.10(1)(h), Petitioner filed

a motion to vacate his judgment of conviction in the Supreme Court, Kings County, on the

following grounds:  (1) ineffective assistance of counsel; (2) removal of jurors during trial

without his consent or presence in the courtroom; (3) use of an unduly suggestive pre-trial line-

up identification procedure; and, (4) prosecutorial misconduct.  (*Id.* at 4, 17.)  Petitioner's motion

to vacate his judgment of conviction was denied on July 23, 2013.  (*Id.* at 8.)  On December 2,

2013, the Appellate Division denied Petitioner's application for a certificate to appeal the lower

court's decision.  (*Id.* at 14.)  On December 3, 2013, Petitioner filed an appeal to the Appellate

Division for a writ of error *coram nobis* on the ground of ineffective assistance of appellate

counsel, which was denied on May 28, 2014.  (*Id.* at 14, 18.)  On June 23, 2014, Petitioner filed

the instant petition.  (*Id.* at 15.)

### STANDARD OF REVIEW

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

28 U.S.C. § 2254 permits a federal court to entertain only those habeas petitions which allege

that a person is in state custody "in violation of the Constitution or laws or treaties of the United

States."  28 U.S.C. § 2254(a).  Section 2254(b)(1) imposes the additional requirement that a

petitioner must have exhausted all state remedies for his claims.  *See id.* § 2254(b)(1).

For claims which were "adjudicated on the merits in [s]tate court proceedings," the

federal habeas court may not grant the application unless the adjudication: (1) resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* § 2254(d). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir. 2002) (quotation marks and citation omitted). "Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker,* 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks and citation omitted). A state court decision is "contrary to" clearly established federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,'" the state court arrived at a different result. *Evans v. Fischer*, 712 F.3d 125, 132 (2d Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.

## DISCUSSION

## I.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

To prevail on a claim for ineffective assistance of trial counsel, Petitioner must satisfy the two-pronged test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *First*, Petitioner must demonstrate that his counsel's performance was "deficient" by showing that "counsel's representation fell below an objective standard of reasonableness" such that he or she "was not functioning as 'counsel' as guaranteed by the Sixth Amendment." *Id.* at 687–88. *Second*,

Petitioner must establish that "the deficient performance prejudiced the defense" by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Id.* at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

As a general matter, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "Because of the difficulties inherent in [evaluating counsel's performance], a court must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* "Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001).

### A.  Counsel's Failure to Present An Alibi Defense

Petitioner argues that his counsel was ineffective because he neglected to call Petitioner's wife to testify at trial, although she "was available to testify at trial that [Petitioner] was home in a different section of Brooklyn" at the time of the shooting.  (Pet'r's Mem. Supp. Habeas Pet. ("Pet'r's Mem.") at 10, ECF No. 12.)  This contention, even if true, does not establish ineffective assistance of counsel.

It is well established that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial . . . [and] will not constitute a basis for an ineffective

9

assistance claim." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987).  In

*Zimmerman v. Burge*, the court held that a defendant did not receive ineffective assistance of

counsel despite counsel's failure to call alibi witnesses, where "[t]he record [was] . . . not entirely

clear as to why, having listed [the alibi witnesses] on the notice of alibi, counsel failed to

produce them."  492 F.Supp. 2d 170, 187 (E.D.N.Y. 2007).  The same logic applies in this case.

 Here, it is unclear why Petitioner's counsel failed to present Petitioner's wife as a witness

despite listing her on the alibi notice.  The Court notes, however, that at sentencing, Petitioner

claimed that he was at his girlfriend's house (not with his wife) at the time of the shooting.

(Resp't's Opp'n, Ex. Z at 132.)  Perhaps counsel's awareness of this inconsistency provided the

basis for the decision not to call Petitioner's wife.  In any event, the record is devoid of evidence

on which the Court could rely to conclude that the decision not to call Petitioner's wife was

anything other than a tactical decision.  Therefore, Petitioner's claim for ineffective assistance of

counsel on this ground must fail.

### B.  Counsel's Failure to Interview Potential Witnesses

 Petitioner claims that his counsel was ineffective for failing to call Poppy, an alleged

eyewitness to A.J.'s shooting, and TaKeya Dorsey, Mr. Clay's then girlfriend, as trial witnesses.

On a habeas petition, "a petitioner may not merely allege that certain witnesses might have

supplied relevant testimony."  *Montalvo v. Annetts*, 2003 WL 22962504, at *26 (S.D.N.Y. Dec.

17, 2003).  Rather, "[a petitioner] must state exactly what testimony they would have supplied

and how such testimony would have changed the result."  *Id*. at *26; *see also Greenidge v. U.S.*,

2002 WL 720677, at *2 (E.D.N.Y. Mar. 27, 2002) (denying habeas relief on a petitioner's claim

for ineffective assistance of counsel for failure to call certain witnesses where the petitioner

failed to specify "how the testimony of those witnesses would have been helpful to his defense").

10

Here, Petitioner failed to explain how either Poppy's or Dorsey's testimony would have changed the result of his trial or in any way aided in his defense.  In fact, Petitioner makes no mention of the potential substance of Poppy's testimony.  As to Dorsey, Petitioner states only that she "could have shed some light on why Yvette Clay would fabricate her story and implicate[] [him] and his co-defendant in the crime."  (Pet'r's Mem. at 15–16.)  This is not enough.  Because Petitioner has failed to identify how testimony from either Poppy or Dorsey would have changed the result of his trial, Petitioner's claims must fail.

### C.  Counsel's Failure to Interview Potential Eyewitnesses

Petitioner argues that his counsel was ineffective in failing to interview and present the testimony of other eyewitnesses to the shooting, including Telfair, Monk, Poppy, and Dorsey. (Pet'r's Mem. at 11.)  Petitioner claims that Telfair "testified in court," outside the presence of the jury, that he was not present when A.J. was shot.  (*Id.*)  According to the record, it was the prosecution that informed the Court that both Telfair and Monk disputed Mrs. Clay's account of A.J.'s shooting.  (Resp't's Opp'n, Ex. X at 120.)  In any event, upon learning of the potential witness testimony, Defendants were each given the opportunity to interview Telfair and Monk before continuing with the proceedings.  (*See id.* at 121.)  After interviewing the two potential witnesses, counsel for both Mr. Clay and Petitioner informed the court that they preferred to call Telfair and Monk at a later date for strategic reasons.  (*Id.* at 121–122.)  Specifically, Petitioner's counsel stated,

> We had a brief conference about calling [Telfair and Monk] out of order. I know both of them are here. [Monk] is going to be sent home and ordered to come back tomorrow. I prefer not to call Naquan Telfair until the other people are called. I understand the People are to call him as a witness in this case and I don't want to put my case on or put a witness on out of order without having that testimony out. I feel uncomfortable about it and I don't think it's proper strategy and I ask the People be directed to bring him back as well with [Monk] after the witnesses have testified.

11

(*Id*.)  Petitioner's counsel subsequently declined to call either witness to testify.  (Resp't's Opp'n, Ex. Y at 125.)  Notably, on this issue, Petitioner's counsel stated, "I also discussed with my client, Mr. Fulcher.  He agrees with me not to call the two witnesses that were here.  We discussed their testimony and heard what they were going to say.  He said he doesn't want to call them at all."  (*Id*.)  Not only was the decision not to call Monk and Telfair a strategic one, it was also one with which Petitioner apparently agreed.  (*Id*. at 126.)  And, as noted, "[c]ourts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005); *see also Eze v. Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003) ("A defense counsel's decision not to call a particular witness usually falls under the realm of trial strategy that we are reluctant to disturb."). Accordingly, Petitioner's claims based on his counsel's failure to interview and present the testimony of other eyewitnesses to the shooting also fail.

### D.  Counsel's Failure to Highlight Inconsistent Testimony

Petitioner argues that trial counsel's failure to cross-examine the police witnesses and Mrs. Clay regarding the inconsistencies in their testimonies was also ineffective.  (Pet'r's Mem. at 12).  Here again, "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim."  *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)).  Indeed, the Second Circuit has held that an attorney's failure to elicit inconsistencies in a witness's testimony that would have been of "enormous value" to the defendant did not constitute ineffective assistance of counsel where the counsel conducted an otherwise adequate cross-examination that "[brought] forth several inconsistencies" in the witness's testimony.  *Eze*, 321 F.3d at 133.

At trial, Captain McGee and Officer Elmore testified that they arrived at the scene of the shooting in separate cars, but both claimed that Deputy Inspector Jeffery Maddrey had ridden in their car.  (Resp't's Opp'n, Ex. W at 77; Resp't's Opp'n, Ex. X at 47–48.)  Petitioner has failed, however, to explain how the inconsistencies surrounding how Deputy Inspector Maddrey arrived at the scene would have affected the jury's judgment regarding the police officers' credibility or Petitioner's guilt.  The timing or manner of Deputy Inspector Maddrey's arrival at the scene had no bearing on the eyewitness testimony or cell-phone evidence which, together, formed the basis of the People's case.  In other words, even if this inconsistency caused the jury to question the credibility of two police officers, the record reflects ample evidence on which the jury could have relied in reaching their guilty verdict.  Moreover, although counsel failed to mention the inconsistency regarding the occupants of the officers' respective vehicles, he nonetheless conducted an adequate cross-examination of both officers and identified other inconsistencies in their testimonies.  (Resp't's Opp'n, Ex. W at 85–88; Resp't's Opp'n, Ex. X at 46–48; Resp't's Opp'n, Ex. Z at 4.)  For example, counsel vigorously questioned Captain McGee regarding his actions immediately following his arrival at the scene of A.J.'s shooting.  (Resp't's Opp, Ex. W at 84–88.)  Likewise, counsel crossed Officer Elmore about an inconsistency regarding Petitioner's name as it appeared in the police records.  (Resp't's Opp'n, Ex. X at 46–47.)  Because Petitioner cannot demonstrate any reasonable likelihood of prejudice under *Strickland*, his claim regarding ineffective assistance of counsel based on counsel's failure to adequately cross-examine witnesses is denied.

### E.  Counsel's Failure to Argue Lack of Probable Cause

Petitioner argues that his counsel was ineffective in failing to argue that "Mrs. Clay's statement to [the] police did not provide them with probable cause" to arrest Petitioner because

the statement did not provide Petitioner's "name, full description, height, weight, [tattoos], [or] hair length." (Pet. at 20.) This contention is meritless because the record clearly demonstrates that Mrs. Clay identified Petitioner to the police by providing his name and a description of his clothing at the time of the shooting. (*See* Resp't's Opp, Ex. W at 115–16.)

### F.  Counsel's Failure to Challenge the Identification Lineup

Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to challenge the identification lineup from which Mrs. Clay identified him as one of A.J.'s shooters. (Pet'r's Mem. at 18–19.) In support of this claim, Petitioner asserts that the identification lineup was unduly suggestive because (1) all of the men in the lineup were told to wear hats, although the two men who shot A.J. were not wearing hats at the time of the shooting, and (2) the "fillers" in the lineup weighed between 160 and 175 pounds, whereas Petitioner weighed 245 pounds. (*Id*. at 18.)

Contrary to Petitioner's assertion, trial counsel did question the police regarding the procedures they employed when creating the lineup. (Resp't's Opp, Ex. T at 25–32; Resp't's Opp, Ex. X at 103–04.) In response to this questioning, Detective Richard Harper stated that the police generally ask all persons in an identification lineup to wear hats and sit down to mitigate differences in hairstyles, height, and build, and thus make the entire procedure "as fair as possible for the subject." (Resp't's Opp, Ex. T at 46–47.) Petitioner's counsel specifically asked Detective Harper whether some of the fillers were "bigger" or "stockier" than Petitioner. (*Id.* at 47.) Detective Harper did not recall. (*Id.*) Therefore, Petitioner's argument that his counsel failed to challenge the lineup is simply without merit.

### G.  Counsel's Failure to Investigate

Petitioner argues that he received ineffective assistance because his counsel failed to go to the crime scene or hire a private investigator to identify seventy-five potential witnesses who

were purportedly present at the time of A.J.'s shooting.  Petitioner maintains that had his counsel conducted further investigation, the result of the proceedings would have been different because those potential eyewitnesses might have provided sufficient testimony to exonerate Petitioner. (Pet'r's Mem. at 20–21.)

Petitioner has failed, however, to present any additional facts or evidence to support this contention.[3]  That is, Petitioner has failed to argue the testimony of any possible witness might have helped his case.  *See McCollough v. Bennett*, 2010 WL 114253, at *12 (E.D.N.Y. Jan. 12, 2010) (rejecting a habeas petitioner's claim that his counsel was ineffective in failing to interview two witnesses who might have been able to offer helpful defense testimony where the petitioner failed to specify who the witnesses were or what testimony they could have provided); *Waters v. Hoke*, 1986 WL 14616, at *2 (E.D.N.Y. Nov. 18, 1986) (rejecting a habeas petitioner's claim that his counsel was ineffective for failing to interview potential defense witnesses where "there [was] no evidence that the testimony of the possible witnesses would have exculpated or even helped petitioner's case" and the petitioner "failed to show any prejudice caused by defense counsel's failure to interview certain defense witnesses").  In any event, the Supreme Court has held that even if defense counsel "does not conduct a substantial investigation into each of several plausible lines of defense, assistance may nonetheless be effective."  *Strickland*, 466 U.S. at 681.  When evaluating whether counsel fulfilled his or her duty to investigate, the Court gives great deference to counsel's judgment and actions.  *See id.* ("[S]trategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based.")  For these reasons, Petitioner's claim that he

---

[3] Detective Harper testified at trial that he returned to the scene of the shooting the next day in an attempt to find witnesses, but no one came forward with information, and not a single person claimed to have witnessed the shooting.  (*See* Resp't's Opp'n, Ex. X at 110.)

received ineffective assistance of counsel based on his trial counsel's failure to hire a private investigator or interview potential defense witnesses is denied.

### H.  Counsel's Failure to Challenge Prejudicial Testimony

At some time prior to trial, the court issued an order prohibiting questioning about a 2006 shooting in which Mr. Clay was injured.  (Pet'r's Mem. at 21.)  During trial, in contravention of the court's order, Mr. Clay's counsel elicited such testimony from Mrs. Clay in the presence of the jury.  Petitioner claims that his counsel was ineffective because he failed to challenge the introduction of this testimony as prejudicial.  (Resp't's Opp, Ex. W at 155–56, 183–85.)  While this testimony had the potential to prejudice Mr. Clay by implicating him in an earlier gang-related incident, it is unclear how this testimony could have affected Petitioner's defense.  And, Petitioner has failed to proffer any evidence demonstrating that he was at all prejudiced by the introduction of this testimony.  Because Petitioner has failed to demonstrate that he was prejudiced by the testimony regarding Mr. Clay's 2006 shooting, Petitioner's claim is denied.

### I.  Counsel's Failure to Challenge Cell Phone Testimony

Petitioner argues that his counsel was ineffective because he was unprepared for the pre-trial suppression hearing on Mr. Clay's motion to suppress the three cell phones retrieved from Lawston's car, and maintains that the results of the suppression hearing would have been different if counsel had been better prepared.  (Pet'r's Mem. at 17.)  Specifically, Petitioner asserts that "[t]rial counsel allowed without objection the admittance of testimony about a cell phone which was allegedly recovered in a vehicle driven by the co-defendant."  (*Id.* at 22.)  Again, Petitioner's contention is unsupported by the record.

Contrary to Petitioner's contention that, during trial, Petitioner's counsel objected to the admission of testimony related to the cell phone on the grounds that the prosecution had failed to

present any concrete evidence linking Petitioner to the cell phone in question.  (Resp't Opp, Ex. Y at 4–5.)  Over counsel's objection, the court allowed testimony regarding the cell phones to be introduced into evidence finding that the jury could draw a "reasonable inference" to connect Petitioner to the cell phone.  (*Id.* at 7.)

Petitioner further argues that his counsel did not adequately pursue any line of questioning which would have established that the cell phone did not belong to Petitioner. (Pet'r's Mem. at 22.)  This claim is also contradicted by the record as Petitioner's counsel emphasized the fact that all three cell phones recovered from Lawston's car were linked to prepaid numbers that do not require any identification to create an account, and that the cell phone provider had "no idea who uses the phone" after the prepaid account is created.  (Resp't Opp, Ex. Y at 50–52.)

## II.   PETITIONER'S SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES AGAINST HIM

Petitioner argues that the admission of A.J.'s dying statement identifying his shooter as Mr. Clay violated Petitioner's Sixth Amendment right to confront his accuser.  (Pet'r's Mem. at 3–4.)  Because the lower state court properly and reasonably applied clearly established federal law in adjudicating this claim on the merits and found that the admission of A.J.'s statement did not violate Petitioner's Sixth Amendment right, this decision is entitled to deference on federal habeas review.  *See* 28 U.S.C. § 2254(b)(1).

As a threshold matter, A.J.'s statement identified Mr. Clay, not Petitioner, as the shooter, (Rep't's Opp., Ex. W at 41.), and thus Petitioner's Confrontation Clause rights were not implicated by the state court's admission of A.J.'s statement.  Moreover, even if the Court concluded that the admission of A.J.'s statement implicated Petitioner's rights, such a finding

would be of no consequence here as whether dying declarations are prohibited under the Confrontation Clause is not a settled matter of law.

Generally, the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Notably, and relevant here, the Supreme Court has expressly declined to decide whether there is a dying declaration exception under the Confrontation Clause. *See Crawford*, 541 U.S. at 56 n.6 ("We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations.").[4] Therefore, even if the state court's admission of A.J.'s statement implicated Petitioner's Sixth Amendment rights, his claim must fail because whether a dying declaration exception exists under the Confrontation Clause is not a matter of clearly established federal law.

## III.   PETITIONER'S RIGHT TO BE PRESENT DURING JURY SELECTION

Petitioner also claims that he was impermissibly excluded from the courtroom when jurors were dismissed from the case, and that trial counsel improperly permitted jurors to be replaced without his consent.[5] (Pet. at 21.) Petitioner's contentions are yet again contradicted by the record. During trial, Juror Number 3 requested to address the court outside the presence of the other jurors. (Resp't's Opp'n, Ex. W at 57.) With all parties present in the courtroom, including Petitioner and his co-defendant, Juror Number 3, appearing anxious and distressed, revealed that she was pregnant and feared that the stress of being a juror in the trial was having a

---

[4] In the absence of such a decision, state courts have routinely permitted the admission of dying declarations at trial. *See People v. Clay*, 88 A.D.3d 14, 27 (N.Y. App. Div. 2011) (collecting cases); *see also Johnson v. Heath*, 2013 WL 2626922, at *1 (E.D.N.Y. June 11, 2013) (rejecting a habeas petitioner's claim that admitting a victim's dying statements into evidence constituted a violation of his Sixth Amendment right to confront the witnesses against him).

[5] Although Petitioner suggests that multiple jurors were excused without his consent, (Pet. at 21) the record reflects that only a single juror was excused from trial.

18

negative effect on her health.  (*Id.* at 57.)  Counsel for both defendants and the judge discussed

the matter and agreed that Juror Number 3 should be replaced with the first alternate juror.  (*Id.*

at 65.)  Petitioner was present in the room during these discussions.  In fact, before dismissing

Juror Number 3, the court expressly asked the parties for an evaluation of the juror's behavior,

noting that "as all counsel are aware, as well as the defendants, since they were present as well, it

is as though the more the [c]ourt spoke to [Juror Number 3], the more she cried."  (*Id.* at 62.)

Thus, Petitioner's claim is dismissed as meritless.

## IV.   EXCESSIVE SENTENCE

Petitioner contends that he received an excessive sentence given his limited prior criminal

history.  However, an excessive sentence claim must fail where the petitioner's sentence was

within the range of sentences permissible under state law.  *White v. Keane*, 969 F.2d 1381, 1383

(2d Cir. 1992) ("[N]o federal constitutional issue is presented where . . . the sentence [provided

was] within the range prescribed by state law."); *see also Alfini v. Lord*, 245 F.Supp.2d 493, 502

(E.D.N.Y. 2003) ("It is well settled that an excessive sentence claim may not be raised as

grounds for habeas corpus relief if the sentence is within the range prescribed by state law.").

Here, Petitioner's sentence of twenty-five years to life was within the range prescribed by New

York state law for second degree murder.  *See* N.Y. Penal Law § 70.00 ("For a class A-I felony,

such minimum period shall not be less than fifteen years nor more than twenty-five years"); N.Y.

Penal Law § 125.25 ("Murder in the second degree is a class A-I felony.).  Accordingly,

Petitioner's claim is meritless.

## V.   PETITIONER'S PROCEDURALLY BARRED CLAIMS

In New York, a petitioner is deemed to have fully exhausted his remedies where (1) the

petitioner has litigated his claims to the Appellate Division, and (2) if the claim was denied by

the Appellate Division, the petitioner pursued an appeal from the denial. *See Kelly v. Griffin*, 2013 WL 1833240, at *3 (W.D.N.Y. May 1, 2013).

Here, Petitioner has failed to exhaust his prosecutorial misconduct claim because he did not assert this claim in state court on the same bases asserted in the instant petition. "To adequately exhaust a claim, a petitioner must have 'fairly presented' the claim to the state court." *Nelson v. Perez*, 2018 WL 1155992, at * 2 (E.D.N.Y. Mar. 2, 2018) (quoting *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982)). "In order to have fairly presented his federal claim to the state court[] the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Robinson v. Kirk*, 1988 WL 2490, at *1 (E.D.N.Y. Jan. 4, 1988) (quoting *Daye*, 696 F.2d at 191).[6]

Likewise, Petitioner's claim that his due-process rights were violated by the state court's refusal to permit his counsel to argue that Mrs. Clay had a motive to fabricate her testimony. (Pet'r's Mem. at 6–8.) This claim is similarly barred because he failed to raise this claim in his leave application to the Court of Appeals. *See Coleman*, 501 U.S. at 731 ("[I]n a federal system,

---

[6] Even if the Court were to reach Petitioner's prosecutorial misconduct claim, the Court would find it to be meritless. Petitioner specifically alleges that the prosecutor knowingly presented the perjured testimonies of Officer Elmore and Captain McGee. (Pet'r's Mem. at 23–24.) The sole inconsistency identified by Petitioner is that both Captain McGee and Officer Elmore testified that they arrived at the scene of the shooting in separate cars, but that Deputy Inspector Jeffery Maddrey traveled to the scene in each of their cars. (Resp't's Opp'n, Ex. W at 77.). With respect to perjured testimony, "a conviction must be set aside if 'the prosecution knew, or should have known, of the perjury,' *and* 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Grant v. Ricks*, 2003 WL 21847238, at *4 (E.D.N.Y. July 29, 2003) (emphasis added) (citation omitted). In Petitioner's case, there is no indication that the prosecution knowingly suborned the police officers' contradictory testimony. Even assuming *arguendo* that the testimony was knowingly false, Petitioner has failed to demonstrate any reasonable likelihood that an inconsistency regarding which police officers were riding in which vehicle could have affected the ultimate judgment of the jury. Petitioner further claims that the prosecution engaged in misconduct by improperly attributing the Marcus Karrby cell phone to Petitioner. (Pet'r's Mem. at 24.) However, the People's use of the cell phone as evidence and related attempt to link Petitioner to the cell phone were expressly permitted by the trial judge. *See Friedgood v. Keane*, 51 F.Supp.2d 327, 344 (E.D.N.Y. 1999) ("In the face of the trial court's specific determination approving the prosecutor's role, the court fails to see how the prosecutor's action could be termed misconduct.").

the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights.").

Finally, Petitioner's ineffective assistance of appellate counsel claim is also barred because he failed to fully exhaust his remedies as to that claim. Although Petitioner timely filed a motion for a writ of error *coram nobis* with the Appellate Division, when the Appellate Division denied Petitioner's motion on May 28, 2014, Petitioner was required to further move for leave to appeal to the Court of Appeals in order to fully exhaust this claim. *See Diaz v. Graham*, 2011 WL 1303924, at *2 (E.D.N.Y. Mar. 31, 2011) (finding that a habeas petitioner's claim for ineffective assistance of counsel remained unexhausted where the petitioner did not appeal to the Court of Appeals following the Appellate Division's denial of a writ of error *coram nobis*).[7]

"In the case of a procedural default . . . [the court] may reach the merits of the claim only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Harrison v. Griffin*, 2017 WL 3105853, at *4 (E.D.N.Y. July 20, 2017) (quotation marks omitted) (citing *St. Helen v. Senkowski*, 374 F.3d 181, 184 (2d Cir. 2004)). Here, Petitioner is unable to overcome his procedural defaults because he has failed to demonstrate cause or prejudice, or present any additional facts or evidence to suggest actual innocence.

---

[7] In any event, Petitioner's claim is meritless. Petitioner argues that he received ineffective assistance of appellate counsel because his attorney raised only Petitioner's Sixth Amendment right to confront witnesses in the leave application to the Court of Appeals, omitting other claims such as ineffective assistance of trial counsel and an excessive sentence claim. (Pet'r's Mem. at 26–29.) New York courts have consistently held that defendants are not necessarily denied effective assistance of appellate counsel if their attorney failed to raise certain issues on appeal, where the decision to "raise some issues and not others was a strategy decision." *People v. Little*, 88 A.D.2d 671, 672 (N.Y. App. Div. 1982). In this case, Petitioner's appellate counsel could have justifiably concluded that some of Petitioner's claims, including his claims regarding ineffective assistance of trial counsel and an excessive sentence, were sufficiently meritless to omit them from the leave application to the Court of Appeals. Further, the Supreme Court has suggested that defendants do not have a right to counsel on a second-level appeal. *See Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982). If Petitioner did not have a clearly established right to second-level appellate counsel, he certainly did not have a right to the effective assistance of second-level appellate counsel. *See id.* ("Since [petitioner] had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely.")

Accordingly, Petitioner's claims for prosecutorial misconduct, violation of his right to due process, and ineffective assistance of appellate counsel must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court denies Petitioner's petition for a writ of habeas corpus in its entirety.  Because Petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability will issue.  *See* 28 U.S.C. § 2253; *see also Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 112–13 (2d Cir. 2000).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).  The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: Brooklyn, New York
     February 22, 2022

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

22